## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

HELLO FARMS LICENSING MI LLC,

      Plaintiff/Counter-Defendant,      Case No.: 4:21-cv-10499

v.      Hon. Matthew F. Leitman

GR VENDING MI, LLC and      Magistrate Judge Patricia T. Morris
CURA MI, LLC,

      Defendants/Counter-Plaintiffs.

## DEFENDANTS' AMENDED ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendants/Counter-Plaintiffs, GR Vending MI, LLC, a Michigan limited liability company, and CURA MI, LLC, a Michigan limited liability company ("Defendants"), by its attorneys Honigman LLP, state for its Answer to Complaint and Affirmative Defenses as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Hello Farms is a Michigan limited liability company with its principal place of business located at 580 Shenfield Road, Au Gres, Michigan 48703.

**ANSWER: Defendants admit that Hello Farms is a Michigan limited liability company. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

2.      Hello Farms owns and operates an outdoor cannabis farm from the 580 Shenfield Road location.

**ANSWER: Defendants admit that Hello Farms operates an outdoor cannabis farm at 580 Shenfield Road, Au Gres, Michigan 48703. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

3.      Defendant GR MI VENDING, LLC ("Buyer" or "Curaleaf") is a Michigan limited liability company that conducts business in Arenac County, Michigan.

**ANSWER: Defendants admit that GR Vending MI, LLC is a Michigan limited liability company that conducts business in Arenac County, Michigan. Defendants deny the remaining allegations contained in this paragraph.**

4.      Defendant Curaleaf and Hello Farms entered into a contract for Curaleaf or one of its licensed affiliates (hereinafter, "Curaleaf") to purchase Hello Farms's entire 2020 harvest and 2021 harvest of cannabis from the Au Gres farm.

**ANSWER: Defendants admit that GR Vending MI and Hello Farms entered into the Agreement that is attached to the Complaint as Exhibit A. Defendants deny any allegations contained in this paragraph that are inconsistent with the Agreement.**

5.      In the contract, the parties estimated the entire 2020 harvest would be between 12,000 to 15,000 pounds.

**ANSWER: Defendants admit that GR Vending MI and Hello Farms entered into the Agreement that is attached to the Complaint as Exhibit A.**

**Defendants deny any allegations contained in this paragraph that are inconsistent with the Agreement.**

6.     Defendant CURA MI, LLC ("Guarantor"), entered into a guaranty to induce Plaintiff to enter into the contract with Curaleaf, and guaranteed all of Curaleaf's obligations to Hello Farms.

**ANSWER: Defendants admit that Cura MI executed a guaranty attached to the Complaint as Exhibit A ("Guaranty"). Defendants deny any allegations contained in this paragraph that are inconsistent with the Guaranty.**

7.     The amount in controversy exceeds $25,000.00, exclusive of interest, costs, and fees.

**ANSWER: This paragraph constitutes a legal conclusion to which no answer is required.**

8.     Venue is proper under MCL § 600.1621, since all the parties conduct business in Arenac County, Michigan.

**ANSWER: Defendants admit that Hello Farms and GR Vending MI conduct business in Arenac County. The remaining allegations contained in this paragraph constitute a legal conclusion to which no answer is required.**

9.     Venue is also proper in Arenac County because that is where the contract at issue was agreed to be performed, was performed in part by Curaleaf, performed in full by Hello Farms, and breached by Curaleaf.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement. The remaining allegations contained in this paragraph constitute legal conclusions to which no answer is**

required. **To the extent an answer is required, Defendants deny that Hello Farms performed all of its obligations under the Agreement and that Curaleaf breached the Agreement.**

## COMMON ALLEGATIONS

**A. The Parties Entered Into a Contract.**

10.    On November 23, 2020, the parties entered into a contract.

**ANSWER: Defendants admit that the parties entered into the Agreement on November 23, 2020.**

11.    The contract is an Amended and Restated Purchase Order Agreement (the "Contract"). **Exhibit A.**

**ANSWER: Defendants admit that GR Vending MI and Hello Farms entered into the Agreement that is attached to the Complaint as Exhibit A.**

12.    The Contract amended, replaced, superseded, and restated a prior, agreement between Hello Farms as the Seller and Curaleaf as the Buyer dated October 5, 2020.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

13.    Under the prior agreement, Curaleaf or one of its licensed affiliates was to purchase cannabis from Hello Farms at a price greater than $2,000.00 per pound.

**ANSWER: The prior agreement speaks for itself, and Defendants deny any allegations inconsistent with the prior agreement.**

14.    Under the amended Contract, the price was reduced to a maximum of $1,000.00/pound, if the THC content met or exceeded 12% per pound. The Contract

4

has a sliding scale for price if the THC content was less than 12% per pound, and the price declined if the THC content declined.

**ANSWER:  The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

15.    The entire 2020 harvest from Hello Farms has 12% THC per pound or greater.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

16.    Hello Farms did not want to amend the original contract.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

17.    Curaleaf convinced Hello Farms to amend the prior agreement by entering into the Contract.

**ANSWER:  Defendants admit that GR Vending MI and Hello Farms entered into the Agreement that is attached to the Complaint as Exhibit A, and that the Agreement amended, replaced, and restated that certain Purchase Order Agreement entered into between GR Vending MI and Hello Farms dated October 5, 2020. Defendants deny any allegations inconsistent with the Agreement.**

18.    Curaleaf did so by stating that, if the parties did not amend the prior agreement, Curaleaf would not perform because the price was too high, the market for the cannabis had dropped, and Curaleaf would not make enough money at the original contract price.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

19.    Hello Farms did not want to amend the prior contract simply because Curaleaf would make less money as a middle man, but as a start-up farm Hello

Farms was more concerned with getting its first successful season behind it and already had Curaleaf lined up to purchase the entire harvest.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

20.    Hello Farms did not want to spend valuable time trying to find new buyers for the 2020 harvest if Curaleaf breached the original agreement and did not purchase the harvest as agreed.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

21.    More important to Hello Farms was to complete a sale of the harvest even if it meant allowing Curaleaf to purchase at a price less than agreed to under the original contract, because that would allow Hello Farms to have a successful first season—the most important and most difficult task at hand.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

22.    Curaleaf also pressured Hello Farms to amend the prior agreement by entering into the Contract by stating how much "larger," "more sophisticated," and "richer" Curaleaf is than Hello Farms.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

23.    Curaleaf also knew Hello Farms deeply desires to complete a sale of its first harvest so that it can concentrate on the 2021 harvest and building up a successful farm.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

24.    To induce Hello Farms to amend the prior agreement, Curaleaf stated to Hello Farms that Hello Farms "did not understand" the market, threatened that Hello Farms "needed" Curaleaf to get through a first and critical season, and asserted that Hello Farms did not know as much as Curaleaf about industry since Curaleaf is a leader in the cannabis industry and was even in the process of its initial public offering on the Canadian Securities Exchange.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

25.    Curaleaf stressed to Hello Farms that amending the prior agreement and entering into the Contract was valuable move to Hello Farms because it would (a) allow Hello Farms to get through its first season successfully; (b) guarantee Hello Farms would have a buyer for its entire 2021 harvest as well and at fixed prices and therefore also successfully complete a second season; (c) allow Hello Farms to avoid any dispute with Curaleaf if Curaleaf decided it did not want to perform under the original contract because Curaleaf knew it could leave Hello Farms high and dry since Hello Farms agreed to sell the entire harvest to *one Buyer;* and (d) ensure, even at reduced prices from the original contact, Hello Farms could be still be successful, since the $1,000.00/pound price still allowed Hello Farms to make some profit.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

26.    Hello Farms agreed and the parties entered into the Contract.

**ANSWER: Defendants admit that GR Vending MI and Hello Farms entered into the Agreement attached to the Complaint as Exhibit A. Defendants deny any allegations inconsistent with the Agreement.**

27.    The Contract governs the parties' rights and duties.

**ANSWER: This paragraph constitutes a legal conclusion to which no answer is required.**

**B. Other Terms of the Contract.**

28.    The Contract as amended states Curaleaf or one of its licensed affiliates will purchase from Hello Farms a minimum of two harvests (2020 and 2021) from the outdoor grow facility in Au Gres.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

29.     The form of the cannabis sold and purchased under the Contract is called "Biomass."

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

30.     The purchase covered 100% of the marijuana Biomass produced by Hello Farms in its 2020 and 2021 harvests from the entire plantable land at the outdoor Au Gres grow.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

31.     In the Contract, Hello Farms and Curaleaf estimated that the harvest would produce between 12,000 and 15,000 pounds.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

32.     The Contract also provides Curaleaf a right of first refusal for the 2022 and 2023 harvests from Hello Farms.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

**C. Pick Up and Payment Terms.**

33.     The parties agreed in the Contract that the harvest would be picked up by Curaleaf in lots that would be put together by Hello Farms.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

34.     The Contract states that Hello Farms would have the product tested and provide testing data relating to each of the lots to Curaleaf.

**ANSWER:** **The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

35.    The testing data would indicate whether the Biomass passed testing requirements set forth in the Contract.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

36.    The Contract refers to the documents showing passing test results as a "Passing COA" for each lot.

**ANSWER:** **The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

37.    The Contract states the lots of Biomass would all be paid for by Curaleaf within seven (7) days of Hello Farms sending Passing COAs to Curaleaf and issuing an invoice.

**ANSWER:** **The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

38.    The Contract specifies that after payment Curaleaf may pick up the Biomass.

**ANSWER:** **The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

39.    The Contract specifies that Curaleaf could not pick up any lot of the Biomass until after it made payment for that lot.

**ANSWER:** **The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

40.    The Contract also specifies that all Biomass must be picked up by Curaleaf within sixty (60) days of Hello Farms sending Passing COAs.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

41.    Under the plain terms of the Contract, Curaleaf knew that it would be paying up to $1,000.00/pound, or around $15,000,000.00 if the 2020 harvest produced the expected 15,000 pounds of Biomass.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

### D. Testing Started The Day After the Contract Was Signed.

42.    The Contract was signed on November 23, 2020, and the testing of the Biomass began the following day, November 24, 2020.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

### E. Hello Farms Delivered All Passing COAs by December 14, 2020.

43.    By notice dated December 14, 2020, all of the passing COAs for the entire 2020 harvest were delivered by Hello Farms to Curaleaf.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

44.    The sending of notice by December 14, 2020 of all passing COAs for the entire 2020 harvest was entirely consistent with the terms of the Contract.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

45.    Curaleaf picked up the first two lots only, approximately 2,000 of the Biomass.

**ANSWER:** **Defendants admit that Curaleaf paid for and picked up two Lots constituting approximately 2,000 pounds of Biomass.**

46. Curaleaf paid for that first two lots of Biomass of approximately 2,000 pounds at the Contract price of $1,000.00/pound.

**ANSWER: Defendants admit the allegations contained in this paragraph.**

47. Curaleaf has refused and failed to pay for the balance of the 2020 harvest of Biomass, despite delivery of the passing COAs for the balance of the 2020 harvest.

**ANSWER: Defendants admit Curaleaf has not paid for the balance of the 2020 harvest because Hello Farms' prior material breaches of the Agreement excuse Curaleaf's performance under the Agreement. Defendants admit that Hello Farms delivered Passing COAs for what it purports to be its entire 2020 harvest. Defendants lack knowledge or information sufficient to form a belief as to the truth regarding whether the COAs provided by Hello Farms to Curaleaf relate to the entire 2020 harvest.**

48. Curaleaf additionally deposited 20% of the total estimated purchase price, the amount of Two Million Two Hundred Thousand Eight Hundred and 00/100 Dollars ($2,237,800.00), as called for under the Contract (the "Deposit").

**ANSWER: Defendants admit the allegations contained in this paragraph.**

49. The Contract states the Deposit is forfeited if Curaleaf does not buy the entire harvest from Hello Farms.

**ANSWER:** **The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

**F. Curaleaf Breached and Further Repudiated the Contract.**

50.    Curaleaf has refused to purchase the balance of the 2021 harvest other than the first approximate 2,000 pounds.

**ANSWER:** **Defendants admit that it has not purchased the balance of the 2020 or 2021 harvest because of Hello Farms' prior material breaches of the Agreement that excuse Curaleaf's performance under the Agreement.**

51.    The price of Biomass has dropped since the Contract was signed on November 23, 2020.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

52.    Curaleaf does not dispute that the price of Biomass has dropped since the Contract was signed on November 23, 2020.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

53.    The market drop in value of Biomass since the Contract was signed is why Curaleaf no longer wants to live up to its obligations under the Contract to pay for and pick up the entire 2020 harvest.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

54.    After picking up the first approximate 2,000 pounds of Biomass, Curaleaf sought a 60% price reduction on the balance of the harvest from Hello Farms.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

55.     Hello Farms rejected that request and demanded adequate assurance of performance under the Contract.

**ANSWER: Defendants admit that Hello Farms demanded adequate assurance of performance under the Contract.**

56.     Curaleaf failed and refused to provide adequate assurance.

**ANSWER:  Defendants admit that Curaleaf refused to provide adequate assurance of performance under the Agreement, because Curaleaf is excused from performing any obligation to perform its obligations under the Agreement because of Hello Farms' prior material breaches of the Agreement.**

57.     Despite that breach by Curaleaf, the parties continued to talk and Hello Farms has tried to salvage the Contract but Curaleaf plainly refuses to carry out the deal, even under the reduced prices in the Contract versus the prices agreed in the original contract.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

58.     It is clear to Hello Farms that Curaleaf will not proceed with buying the entire 2020 harvest as agreed unless Hello Farms again substantially drops the price.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

59.     Curaleaf also has stated it will not perform as to the 2021 harvest either.

**ANSWER: Defendants admit that Curaleaf informed Hello Farms that Curaleaf is excused from its obligations under the Agreement, including purchasing Hello Farms' 2021 harvest, because of Hello Farms' prior material breaches of the Agreement. Defendants deny that Curaleaf has an obligation**

13

**to purchase biomass from Hello Farms' 2021 harvest that amounts to a quantity that is unreasonably disproportionate to Hello Farms' stated estimate and any normal or otherwise comparable prior output by Hello Farms and biomass producers. Hello Farms claims that its 2021 harvest will yield 90,000 pounds of biomass, which is more than six times the estimated yield of its 2020 harvest as set forth in the Agreement.**

60.     In discussing Curaleaf s breach with Curaleaf, Hello Farms has asked nothing more than that Curaleaf simply perform under the Contract.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

61.     Curaleaf has failed to articulate any coherent reason why it does not have to perform under the parties' unambiguous Contract, as agreed.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

62.     Rather, Curaleaf has accused Hello Farms of failing to timely make the Biomass available under the Contract, an assertion that is utterly meritless.

**ANSWER:  Defendants admit that Curaleaf gave notice to Hello Farms that it was in default under the Agreement for, among other reasons, its failure to timely deliver Lots of Biomass. Defendants deny the remaining allegations contained in this paragraph.**

63.     First, there is no deadline stated in the Contract for the Biomass to be made available.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

64.     Second, the testing began literally the day after the Contract was signed, coincidentally also the week of Thanksgiving 2020.

14

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

65.    There is also no deadline in the Contract for the Passing COAs to be delivered.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

66.    The passing COAs for the entire 2020 harvest of Biomass were delivered by December 14, 2020, a mere 21 days after the Contract was even signed.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

67.    Curaleaf also knew that the Biomass had to be tested *and pass testing* before pickup.

**ANSWER:  The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

68.    That is a term of the unambiguous Contract that Curaleaf convinced Hello Farms to sign as an amendment of the original agreement.

**ANSWER:  The allegations contained in this paragraph constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

69.    The Contract states that Hello Farms can select the testing facility but it had to be approved by Curaleaf.

**ANSWER:  The Agreement speaks for itself, and Defendants deny any allegations inconsistent with Agreement.**

70.    Curaleaf required Hello Farms to use Infinite Chemical Analysis Labs MI, LLC in Jackson, Michigan as the testing facility, and Hello Farms agreed.

**ANSWER:** Defendants admit the allegations contained in this paragraph.

71.    Infinite Chemical Analysis Labs MI, LLC in Jackson, Michigan inspected all of the 2020 harvest and issued Passing COAs to Hello Farms for the entire 2020 harvest of Biomass.

**ANSWER:  Defendants admit that Hello Farms provided Passing COAs issued by Infinite Chemical Analysis Labs MI, LLC for Biomass that Hello Farms purports to be its entire 2020 harvest. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

72.    No portion of the 2020 harvest for sale under the Contract failed testing, none.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

73.    The real reason Curaleaf is not paying for the Biomass as agreed is because it wants to again foist the market decline of Biomass price on to Hello Farms.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

74.    The market price for Curaleaf is not rich enough in Curaleaf s view, so it wants to buy the product cheaper and it wants Hello Farms to pay for that even though the Contract provides just the opposite.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

75.    Curaleaf's failure to pay for the balance of the 2020 harvest of Biomass of approximately 14,000 pounds despite delivery of the passing COAs is a breach of the parties' Contract.

**ANSWER:** **The allegations contained in this paragraph constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

76.    Curaleaf's statement that it will not perform under the Contract with respect to purchasing the 2021 harvest as agreed is a repudiation and is properly treated as a breach of the Contract.

**ANSWER:** **The allegations contained in this paragraph constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

**G. Curaleaf Agreed to a $2.2 Million Deposit That Is Forfeited.**

77.    The Contract states the Deposit is forfeited if Curaleaf does not buy the entire harvest from Hello Farms.

**ANSWER:** **The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

78.    Hello Farms is entitled to a money judgment against Curaleaf for its failure to purchase the balance of the 2020 harvest as agreed in the Contract, which covers about 14,000 pounds of Biomass, at $1,000.00/pound, with total damages being $14 Million, plus incidental and all other damages naturally flowing from Curaleaf s breach.

**ANSWER:** **This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, the Defendants deny the allegations contained in this paragraph.**

79.    Hello Farms is also entitled to declaratory relief in the form of a Judgment of this Court stating that the Contract provides that Curaleaf is required

to purchase the entire 2021 harvest from Hello Farms as set forth in the Contract, and that Hello Farms is entitled to retain the Deposit.

**ANSWER: This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, the Defendants deny the allegations contained in this paragraph.**

80.    Hello Farms is also entitled to an order of specific performance arising out of Curaleaf s breach of the Contract as to the 2021 harvest.

**ANSWER: This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, the Defendants deny the allegations contained in this paragraph.**

## COUNT I — BREACH OF CONTRACT

81.    Hello Farms incorporates its prior allegations as if fully repeated.

**ANSWER: Defendants restate and incorporate its answers to the Complaint's prior allegations as if fully set forth herein.**

82.    The Contract as amended states Curaleaf will purchase from Hello Farms a minimum of two harvests (2020 and 2021) from Hello Farms's outdoor grow facility in Au Gres.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with Agreement.**

83.    By notice dated December 14, 2020, all of the passing COAs for the entire 2020 harvest were delivered by Hello Farms to Curaleaf.

**ANSWER: Defendants deny the allegations contained in this paragraph.**

84.    Curaleaf picked up approximately 2,000 of the Biomass from Hello Farms under Contract and paid the Contract price for that product.

**ANSWER:  Defendants admit that Curaleaf paid for and picked up two Lots constituting approximately 2,000 pounds of Biomass.**

85.    Curaleaf has refused and failed to pay for the balance of the 2020 harvest of Biomass.

**ANSWER:  Defendants admit that it has not purchased the balance of the 2020 or 2021 harvest because Hello Farms' prior material breaches of the Agreement excuse Curaleaf's performance under the Agreement.**

86.    Curaleaf's failure to pay for the balance of the 2020 harvest is a breach of the Contract.

**ANSWER:  The allegations contained in this paragraph constitute a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

87.    Hello Farms has been damaged as a result of that breach.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

**WHEREFORE, Defendants respectfully request that this Honorable Court dismiss Plaintiff's Complaint with prejudice, award Defendants their costs and expenses incurred in defending this action, and such other and further relief as this Honorable Court deems just and appropriate.**

## COUNT II — BREACH OF GUARANTY

88.    Hello Farms incorporates its prior allegations as if fully repeated.

**ANSWER: Defendants restate and incorporate its answers to the Complaint's prior allegations as if fully set forth herein.**

89.    The Contract as amended states Curaleaf will purchase from Hello Farms a minimum of two harvests (2020 and 2021) from Hello Farms's outdoor grow facility in Au Gres.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

90.    The price of Biomass has declined between the date the Contract was signed on November 23, 2020 and the date of this complaint.

**ANSWER: Defendants admit the allegations contained in this paragraph.**

91.    By notice dated December 14, 2020, all of the passing COAs for the entire 2020 harvest were delivered by Hello Farms to Curaleaf.

**ANSWER: Defendants deny the allegations contained in this paragraph.**

92.    Curaleaf picked up approximately 2,000 of the Biomass from Hello Farms under Contract and paid the Contract price for that product.

**ANSWER: Defendants admit that Curaleaf paid for and picked up two Lots constituting approximately 2,000 pounds of Biomass.**

93.    Curaleaf has refused and failed to pay for the balance of the 2020 harvest of Biomass.

**ANSWER: Defendants admit that it has not purchased the balance of the 2020 or 2021 harvest because Hello Farms' prior material breaches of the Agreement excuse Curaleaf's performance under the Agreement.**

94.     Curaleaf's failure to pay for the balance of the 2020 harvest is a breach of the Contract.

**ANSWER: This paragraph contains a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

95.     Hello Farms has been damaged as a result of that breach.

**ANSWER: Defendants deny the allegations contained in this paragraph.**

96.     Defendant CURA MI, LLC is the Guarantor of Curaleaf's obligations to Hello Farms. See **Exhibit A** at p. 5.

**ANSWER: Defendants admit that Cura MI executed that certain Guaranty in favor of Hello Farms. The Guaranty speaks for itself, and Defendants deny any allegations inconsistent with the Guaranty.**

97.     Defendant CURA MI, LLC has refused and failed to honor the terms of the Guaranty.

**ANSWER: Defendants deny the allegations contained in this paragraph.**

98.     Defendant CURA MI, LLC's refusal and failure to honor the terms of the Guaranty is a breach of the Guaranty.

**ANSWER: This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

99.     Hello Farms has been injured as a result of Defendant CURA MI, LLC's breach of the Guaranty.

**ANSWER:** **This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

**WHEREFORE, Defendants respectfully request that this Honorable Court dismiss Plaintiff's Complaint with prejudice, award Defendants their costs and expenses incurred in defending this action, and such other and further relief as this Honorable Court deems just and appropriate.**

## COUNT III

### DECLARATORY JUDGMENT FOR THE 2021 HARVEST

100.   Hello Farms incorporates its prior allegations as if fully repeated.

**ANSWER:** **Defendants restate and incorporate its answers to the Complaint's prior allegations as if fully set forth herein.**

101.   The Contract as amended states Curaleaf will purchase from Hello Farms a minimum of two harvests (2020 and 2021) from Hello Farms's outdoor grow facility in Au Gres.

**ANSWER:** **The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

102.   Curaleaf has stated in writing that it will not honor the Contract and purchase the 2021 harvest.

**ANSWER:** **Defendants admit that it has notified Hello Farms that it will not purchase the 2021 harvest because of Hello Farms' prior material breaches of the Agreement excuse Curaleaf's performance under the Agreement.**

**Defendants deny that Curaleaf has an obligation to purchase biomass from Hello Farms' 2021 harvest that amounts to a quantity that is unreasonably disproportionate to Hello Farms' stated estimate and any normal or otherwise comparable prior output by Hello Farms and biomass producers. Hello Farms claims that its 2021 harvest will yield 90,000 pounds of biomass, which is more than six times the estimated yield of its 2020 harvest as set forth in the Agreement.**

103.   The price of Biomass has declined between the date the Contract was signed on November 23, 2020 and the date of this complaint.

**ANSWER: Defendants admit the allegations contained in this paragraph.**

104.   After notice dated December 14, 2020 of all of the passing COAs for the entire 2020 harvest were delivered by Hello Farms to Curaleaf, Curaleaf sought a 60% price drop from the Contract price from Hello Farms.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

105.   Curaleaf picked up approximately 2,000 of the Biomass from Hello Farms under Contract and paid the Contract price for that product.

**ANSWER: Defendants admit that Curaleaf paid for and picked up approximately 2,000 pounds of the Biomass from Hello Farms as contemplated under the Agreement.**

106.   Curaleaf has refused and failed to pay for the balance of the 2020 harvest of Biomass.

**ANSWER:** **Defendants admit that Curaleaf has refused to pay for the balance of the 2020 harvest of Biomass because of Hello Farms' prior material breaches of the Agreement that thereafter excuse Curaleaf's performance under the Agreement.**

107.   Curaleaf's failure to pay for the balance of the 2020 harvest is a breach of the Contract.

**ANSWER:** **The allegations contained in this paragraph constitute a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

108.   Hello Farms has been damaged as a result of that breach.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

109.   Defendant CURA MI, LLC is the Guarantor of Curaleaf's obligations to Hello Farms. See **Exhibit A** at p. 5.

**ANSWER:** **The Guaranty speaks for itself, and Defendants deny any allegations inconsistent with the Guaranty.**

110.   Defendant CURA MI, LLC has refused and failed to honor the terms of the Guaranty.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

111.   Defendant - CURA MI, LLC's refusal and failure to honor the terms of the Guaranty is a breach of the Guaranty.

**ANSWER:** **This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

112.   Hello Farm has been injured as a result of Defendant CURA MI, LLC's breach of the Guaranty.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

113.   After Curaleaf's breach, Hello Farms requested adequate assurance that Curaleaf would perform as stated in the Contract, which includes as to the 2021 harvest.

**ANSWER:** **The allegation that Curaleaf breached the Agreement is a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny that Curaleaf has breached the Agreement. Defendants admit that Hello Farms demanded assurance that Curaleaf would perform the Contract, and Defendants deny that it is properly entitled to do so because of its prior material breaches that excuse Curaleaf's obligations under the Agreement.**

114.   Curaleaf refused to confirm it would perform any portion of the Contract, including as to the 2021 harvest.

**ANSWER:** **Defendants admit that Curaleaf has refused to confirm that it will continue to perform under the Agreement because of Hello Farms' prior material breaches of the Agreement that excuse Curaleaf's performance under the Agreement.**

115.   Curaleaf's failure to confirm is a repudiation and treated as a breach of the Contract.

**ANSWER: This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

116.   Curaleaf maintains that it is not required to purchase the 2021 harvest.

**ANSWER: Defendants admit that the allegations contained in this paragraph because of Hello Farms' prior material breaches under the Agreement.**

117.   Curaleaf's statements put Plaintiff's entire farming operations at risk of failure.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

118.   If Curaleaf was not obligated to purchase the entire 2021 harvest, then Curaleaf would have to locate buyers for tens of thousands of pounds of Biomass, in addition to growing the harvest.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

119.   A judicial determination is needed to guide Hello Farms's future conduct, and Curaleaf's and Guarantor's future conduct, so that the parties know whether Curaleaf is obligated to purchase the entire 2021 harvest.

**ANSWER: This paragraph contains legal conclusions to which no answer is required.**

**WHEREFORE, Defendants respectfully request that this Honorable Court dismiss Plaintiff's Complaint with prejudice, award Defendants their**

costs and expenses incurred in defending this action, and such other and further relief as this Honorable Court deems just and appropriate.

## COUNT IV

## SPECIFIC PERFORMANCE FOR THE 2021 HARVEST

120.   Hello Farms incorporates its prior allegations as if fully repeated.

**ANSWER: Defendants restate and incorporate its answers to the Complaint's prior allegations as if fully set forth herein.**

121.   The Contract as amended states Curaleaf will purchase from Hello Farms a - minimum of two harvests (2020 and 2021) from Hello Farms's outdoor grow facility in Au Gres.

**ANSWER: The Agreement speaks for itself, and Defendants deny any allegations inconsistent with the Agreement.**

122.   Curaleaf has stated in writing that it will not honor the Contract and purchase the 2021 harvest.

**ANSWER: Defendants admit that Curaleaf has stated that it will not continue to perform under the Agreement because of Hello Farms' prior material breaches of the Agreement that excuse Curaleaf's performance under the Agreement. Defendants deny that Curaleaf has an obligation to purchase biomass from Hello Farms' 2021 harvest that amounts to a quantity that is unreasonably disproportionate to Hello Farms' stated estimate and any normal or otherwise comparable prior output by Hello Farms and biomass producers. Hello Farms claims that its 2021 harvest will yield 90,000 pounds**

of biomass, which is more than six times the estimated yield of its 2020 harvest

as set forth in the Agreement.

123.   After notice dated December 14, 2020 of all of the passing COAs for
the entire 2020 harvest were delivered by Hello Farms to Curaleaf, Curaleaf sought
a 60% price drop from the Contract price from Hello. Farms.

**ANSWER: Defendants deny the allegations contained in this**

**paragraph.**

124.   Curaleaf picked up approximately 2,000 of the Biomass from Hello
Farms under Contract and paid the Contract price for that product.

**ANSWER:  Defendants admit that Curaleaf paid for and picked up two**

**Lots constituting approximately 2,000 pounds of Biomass.**

125.   Curaleaf has refused and failed to pay for the balance of the 2020
harvest of Biomass.

**ANSWER: Defendants admit that Curaleaf has refused to pay for the**

**balance of the 2020 harvest because of Hello Farms' prior material breaches**

**of the Agreement that thereafter excuse Curaleaf's performance under the**

**Agreement.**

126.   Curaleaf's failure to pay for the balance of the 2020 harvest is a breach
of the Contract.

**ANSWER: This paragraph contains legal conclusions to which no**

**answer is required. To the extent an answer is required, Defendants deny the**

**allegations contained in this paragraph.**

127.   Hello Farms has been damaged as a result of that breach.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.

128.   Defendant CURA MI, LLC is the Guarantor of Curaleaf's obligations to Hello Farms. See **Exhibit A** at p. 5.

**ANSWER:** The Guaranty speaks for itself, and Defendants deny any allegations inconsistent with the Guaranty.

129.   Defendant CURA MI, LLC has refused and failed to honor the terms of the Guaranty.

**ANSWER:** Defendants admit that CURA MI, LLC has refused to pay for the balance of the 2020 harvest because of, without limitation, Hello Farms' prior material breaches of the Agreement that thereafter excuse Curaleaf's performance under the Agreement. Defendants deny that CURA MI, LLC's refusal to pay constitutes a failure to honor the terms of the Guaranty or constitutes a breach of the Guaranty.

130.   Defendant CURA MI, LLC's refusal and failure to honor the terms of the Guaranty is a breach of the Guaranty.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.

131.   Hello Farms has been injured as a result of Defendant CURA MI, LLC's breach of the Guaranty.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.

132.   After Curaleaf's breach, Hello Farms requested adequate assurance that Curaleaf would perform as stated in the Contract, which includes as to the 2021 harvest.

**ANSWER:** The remaining allegations contained in this paragraph contain legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph except that Defendant admits that Hello Farms requested adequate assurance from Curaleaf.

133.   Curaleaf refused to confirm it would perform any portion of the Contract, including as to the 2021 harvest.

**ANSWER:** Defendants admit the allegations contained in this paragraph. Defendants deny that Curaleaf has an obligation to purchase biomass from Hello Farms' 2021 harvest because of Hello Farms' prior material breaches. Defendants also deny that Curaleaf has an obligation to purchase biomass from Hello Farms' 2021 harvest that amounts to a quantity that is unreasonably disproportionate to Hello Farms' stated estimate and any normal or otherwise comparable prior output by Hello Farms and biomass producers. Hello Farms claims that its 2021 harvest will yield 90,000 pounds

of biomass, which is more than six times the estimated yield of its 2020 harvest as set forth in the Agreement.

134. Curaleaf's failure to confirm is a repudiation and treated as a breach of the Contract.

**ANSWER: This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

135. Curaleaf maintains that it is not required to purchase the 2021 harvest.

**ANSWER: Defendants admit the allegations contained in this paragraph. Defendants deny that Curaleaf has an obligation to purchase biomass from Hello Farms' 2021 harvest because of Hello Farms' prior material breaches. Defendants also deny that Curaleaf has an obligation to purchase biomass from Hello Farms' 2021 harvest that amounts to a quantity that is unreasonably disproportionate to Hello Farms' stated estimate and any normal or otherwise comparable prior output by Hello Farms and biomass producers. Hello Farms claims that its 2021 harvest will yield 90,000 pounds of biomass, which is more than six times the estimated yield of its 2020 harvest as set forth in the Agreement.**

136. Curaleaf's statements put Plaintiff's entire farming operations at risk of failure.

**ANSWER: Defendants deny the allegations contained in this paragraph.**

137.   If Curaleaf was not obligated to purchase the entire 2021 harvest, then Curaleaf would have to locate buyers for tens of thousands of pounds of Biomass, in addition to growing the harvest.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

138.   Curaleaf's purchase of the 2021 harvest from Hello Farms is a unique Contract.

**ANSWER: The allegations contained in this paragraph constitute a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

139.   It would be unfair to allow Curaleaf to avoid its obligations as to the 20201 harvest since it induced Hello Farms to enter into the Contract precisely because of the fixed price guaranty as to the 2020 *and* 2021 harvests.

**ANSWER:  Defendants deny the allegations contained in this paragraph. Defendants deny that Curaleaf has an obligation to purchase biomass from Hello Farms' 2021 harvest because of Hello Farms' prior material breaches. Defendants also deny that Curaleaf has an obligation to purchase biomass from Hello Farms' 2021 harvest that amounts to a quantity that is unreasonably disproportionate to Hello Farms' stated estimate and any normal or otherwise comparable prior output by Hello Farms and biomass producers. Hello Farms claims that its 2021 harvest will yield 90,000 pounds of biomass, which is more than six times the estimated yield of its 2020 harvest as set forth in the Agreement.**

140.    The circumstances of this case make an Order of specific performance equitable.

**ANSWER:** **This paragraph contains legal argument and conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

141.    This Court would be exercising sound discretion in order specific performance for the purchase of the 2021 harvest by Curaleaf.

**ANSWER:** **This paragraph contains legal argument and conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations contained in this paragraph.**

**WHEREFORE, Defendants respectfully request that this Honorable Court dismiss Plaintiff's Complaint with prejudice, award Defendants their costs and expenses incurred in defending this action, and such other and further relief as this Honorable Court deems just and appropriate.**

## AFFIRMATIVE DEFENSES AND OTHER RESPONSIVE MATTER

In further response to the allegations set forth in the Complaint, Defendants GR Vending MI, LLC and CURA MI, LLC, state as follows:

1.    Defendants' restate and incorporate their answers to Hello Farms' allegations and Defendants' allegations set forth in their counterclaims as if fully set forth herein.

2.      Defendants' performance under the Agreement and Guaranty are excused because Hello Farms' committed the first material breach of the Agreement.

3.      Hello Farms' claims are barred because it has unclean hands.

4.      Hello Farms' claims are barred because it has failed to mitigate its alleged damages.

5.      Hello Farms' claims are barred due to illegality.

6.      Defendants reserve the right to assert such other defenses, affirmative defenses, and other responsive matters as may be appropriate following discovery.

WHEREFORE, Defendants respectfully request that this Honorable Court dismiss Plaintiff's Complaint with prejudice, award Defendants their costs and expenses incurred in defending this action, and such other and further relief as this Honorable Court deems just and appropriate.

## <u>COUNTERCLAIM</u>

Defendants/Counter-Plaintiffs GR Vending MI, LLC ("GR Vending"), a Michigan limited liability company, and CURA MI, LLC, a Michigan limited liability company (collectively, "Counter-Plaintiffs"), by their attorneys, Honigman LLP, for their Counter-Complaint against Hello Farms, LLC ("Hello Farms") and Jury Demand, state as follows:

## NATURE OF THE CASE

1.      In a clumsy attempt to maximize its profits on its first harvest of cannabis, Hello Farms repeatedly breached its agreement with its first business partner, GR Vending.  Hello Farms' actions caused millions of dollars of damages to GR Vending.

2.      Hello Farms agreed to test and deliver its first harvest to GR Vending on a rolling basis beginning in late November 2020. Had Hello Farms followed the agreement, GR Vending would have been able to sell Hello Farms' harvest during the crucial December retail period.

3.      Hello Farms refused to follow the agreement. Instead of releasing portions of the harvest to GR Vending after they were tested and ready to release to GR Vending, Hello Farms instead kept the entire harvest at its facility for weeks.

4.      Hello Farms' purposely delayed the delivery of the harvest to GR Vending in an effort to charge GR Vending the highest possible price under the parties' agreement. Each tested "batch" of cannabis was to be assembled into "lots" for delivery to GR Vending – and the price for each lot was dependent on the average THC content of that lot.  Hello Farms wrongfully retained tested batches of the harvest so that it could shuffle and rearrange those batches into lots that qualified for higher prices based on their THC content.

5.     Hello Farms knew that its conduct violated both the letter of the parties' agreement, and its duty of good faith and fair dealing. And Hello Farms knew that its actions would cause substantial damages, costs, and lost profits for GR Vending. Nevertheless, and despite GR Vending's protests, Hello Farms refused to release its harvest until there was no possibility that Hello Farms' cannabis could be processed and sold in the December retail period.

6.     Hello Farms' intentional delay caused damage to GR Vending by requiring it to lose profits and incur additional costs. GR Vending had to purchase additional cannabis from third-parties in late November and early December 2020 to sell in the critical December season – and lost the ability to sell Hello Farms' harvest at a profit in that period.

7.     When GR Vending actually received a few small portions of Hello Farms' harvest, GR Vending's own testing revealed that Hello Farms' cannabis was of very poor quality – and thus breached Hello Farms' warranties to GR Vending. For example, an independent lab confirmed that a portion of Hello Farms' cannabis contained excessive levels of heavy metals, foreign substances, and microbials.

8.     Under the parties' agreement, and due to its numerous breaches of that agreement, Hello Farms is required to return the $2,237,800 deposit that GR Vending provided to Hello Farms.

9.    Hello Farms refuses to return the deposit. On information and belief, Hello Farms is refusing to return the deposit because it has already spent the deposit – yet another violation of the parties' agreement.

10.    For these reasons, as set forth more fully below, GR Vending and Cura MI bring this counter-complaint for damages and declaratory relief.

## PARTIES, JURISDICTION, AND VENUE

11.    GR Vending MI, LLC ("GR Vending") is a Michigan limited liability company.

12.    CURA MI, LLC ("Cura MI") is a Michigan limited liability company.

13.    Hello Farms, upon information and belief, is a Michigan limited liability company.

14.    Hello Farms, upon information and belief, operates an outdoor grow facility at 580 Shenfield Road, Au Gres, Michigan 48703 ("Au Gres Farm").

15.    This Court has subject matter jurisdiction over this matter pursuant to MCL 600.605 because the amount in controversy, exclusive of interest, costs and attorneys' fees, exceeds $25,000.

16.    This Court also has subject matter over this matter pursuant to MCR 2.605 because there is an actual controversy between the parties and GR Vending and Cura MI seek declaratory relief, which this Court has the power to grant.

17.     This Court has personal jurisdiction over Hello Farms pursuant to MCL 600.711.

18.     Venue is proper in the Circuit Court for the County of Arenac pursuant to MCL 600.1621 because Hello Farms has a place of business and conducts business in Arenac County.

## BACKGROUND
### *The Parties' Agreement*

19.     GR Vending and Hello Farms entered into an Amended and Restated Purchase Order Agreement dated November 23, 2020 ("Agreement"). (A copy of the Amended and Restated Purchase Order Agreement is attached as **Exhibit A**.)

20.     Through the Agreement, Hello Farms accepted a number of obligations, terms and conditions, and requirements. Hello Farms agreed that if it did not "entirely meet[] all requirements of [the Agreement]" that GR Vending would not be required to purchase Hello Farms' harvest, and would be entitled to refund of its $2,237,800 deposit.

21.     Hello Farms agreed to strict testing requirements for its cannabis – and warranted that its cannabis would pass State of Michigan requirements for heavy metals, additives, and pesticides.

22.     Hello Farms also provided an independent warranty – that Hello Farms' cannabis would be "merchantable and fit for their intended purpose, and pass without objection in trade at the time of delivery to Buyer."

38

23.     The Agreement amended, replaced, and restated a Purchase Order Agreement entered into between Hello Farms and GR Vending on October 5, 2020 ("Original Agreement").

24.     The Original Agreement was predicated on Hello Farms delivering flower to GR Vending. Seventy percent of Hello Farms' harvest was to be "A" buds that could be sold as premium flower.

25.     Hello Farms, to induce GR Vending to enter into the Original Agreement, repeatedly represented and provided assurance that it would deliver high quality "flower" with high THC potencies that could be saleable as flower in retail dispensaries.  Hello Farms' representations were false.

26.     Shortly after the Original Agreement was signed, Hello Farms's actions revealed that it was wholly unprepared to manage the process to harvest, dry, cure, test, and package the finished flower required under the Original Agreement's terms.

27.     GR Vending allocated significant resources to assist Hello Farms with its first harvest.

GR Vending sent personnel to the Hello Farms' Au Gres Farm to consult and train Hello Farms personnel on the harvest, dry, and cure the cannabis that they had harvested.

28.    GR Vending identified issues with Hello Farms' facility, including a lack of sufficient drying space and a lack of environmental controls in the barn where the flower was stored. These issues made it very likely that Hello Farms' flower would not pass regulatory medical limits for microbials.

29.    Hello Farms failed to correct the fundamental failures in its processes to harvest, dry and cure the cannabis. Hello Farms was unwilling to spend money to preserve its crop of cannabis, and did not bring in freezer trailers to store its harvested cannabis.  Hello Farms also delayed in bringing in remediation devices to deal with microbial issues affecting the cannabis.

30.    As a result of these fundamental mistakes in the processes employed by Hello Farms, it was unable to deliver flower as required by the Original Agreement.

31.    Rather than terminate the Original Agreement entirely, which it could have done, GR Vending restructured the parties' agreement so that there would be no price differentiation among biomass that constituted "A" bud, "B" bud, and trim. Instead of delivering mostly "flower", Hello Farms would be allowed to deliver "trim" — cannabis biomass that did not consist of flower. In sum, GR Vending allowed Hello Farms to salvage its first harvest.

32.     Accordingly, the Agreement, as amended, is the result of GR Vending's restructuring the Original Agreement as an accommodation to Hello Farms.

33.     Ignoring those accommodations, and the resources that GR Vending had provided to assist with the 2020 harvest, Hello Farms almost immediately breached the parties' Agreement.  Although its harvest should have been complete, Hello Farms delayed releasing test results and cannabis to GR Vending, in violation of the Agreement.

### Hello Farms Breaches Its Testing And Delivery Obligations Under The Agreement

34.     Hello Farms agreed to begin to test and deliver its 2020 harvest in November 2020. Hello Farms stated, in the parties' November 24, 2020 agreement, that it expected the 2020 harvest to take place in October/November 2020, and expected that its harvest would be 12,000 to 15,000 pounds of cannabis. Hello Farms further agreed that testing and delivery of the harvest would begin during the "harvest season."

35.     After it received the test results (a "COA"), Hello Farms was required to notify GR Vending that a tested group of batches, a "lot," was ready for payment and delivery.

36.     GR Vending was entitled to accept delivery of a lot within seven days of Hello Farms' receipt of the test results for a lot of cannabis.

41

37.     In short, the Agreement obligates that Hello Farms complete the sale of its 2020 harvest on a rolling basis that would commence in November 2020, and proceed promptly (within days) with delivery of tested cannabis to GR Vending.

38.     The Agreement does not allow Hello Farms to withhold test results, such that delivery to GR Vending is delayed.

39.     Despite its obligations under the Agreement, Hello Farms did not deliver any cannabis to GR Vending in the first weeks of December 2020.

40.     Rather, Hello Farms withheld test results, and the 2020 harvest itself, from GR Vending until mid-December 2020.

41.     During those weeks, GR Vending inquired repeatedly about the availability of lots of cannabis for payment and pick-up, and made repeated demands to Hello Farms to make the cannabis available for payment and pick-up.

42.     Hello Farms delayed the release of test results and delivery of cannabis to GR Vending for its own benefit and to the detriment of GR Vending.

43.     Rather than promptly assembling, testing, and releasing tested cannabis for payment and pick-up, Hello Farms held back test results so that it could mix and match "batches" of cannabis into "lots" that met the maximum THC Potency Testing Level under the Agreement.

44.     Hello Farms engaged in this intentional, bad-faith breach of the Agreement solely in an attempt to mix-and-match early batches of cannabis with the

later-tested batches of the 2020 harvest, such that the average THC level in various "lots" could be sold at a premium.

45.     Hello Farms' delay in making the cannabis available to GR Vending deprived it of cannabis for the December selling season.

46.     The December selling season is a known and generally accepted critical time of year in the cannabis industry.

47.     Had Hello Farms honored its contractual obligations, GR Vending would have received fresh cannabis on a periodic basis beginning in late November 2020 and early December 2020.

48.     Had Hello Farms honored its contractual obligations, GR Vending could have taken the cannabis it received to be promptly processed and sold by it for the critical December selling season.

49.     Hello Farms' withholding of test results and the 2020 harvest itself is not consistent with the Agreement and industry custom and practice.

50.     GR Vending has notified Hello Farms that it breached the Agreement because of its failure to comply with the Agreement's obligations for testing, notifications and delivery of cannabis to GR Vending.

*Hello Farms Refuses To Refund The Deposit*

51.     GR Vending provided a $2,237,800 deposit to Hello Farms prior to entering the Agreement.

52.     Hello Farms agreed that "[t]his deposit amount ("Deposit") is subject to refund if Hello Farms does not sell all of its biomass upon harvest in full, passing local and state recreational cannabis testing requirements and entirely meeting all requirements of this Purchase Order Agreement and the Terms and Conditions."

53.     GR Vending has demanded that Hello Farms refund the Deposit because of its breaches of the Agreement.

54.     GR Vending has also demanded that Hello Farms refund the Deposit because the cannabis has not passed all local and state recreational cannabis testing requirements.

55.     Hello Farms has refused to refund the Deposit.

56.     Upon information and belief, Hello Farms has improperly spent the funds that GR Vending paid which constitute the Deposit.

*Hello Farms' Cannabis Did Not Meet Basic Quality Standards*

57.     GR Vending accepted approximately 2,000 pounds of cannabis from Hello Farms under the Agreement.

58.     GR Vending sent the 2,000 pounds of cannabis to one of its processing partners at the end of December 2020.

59.     The 2,000 pounds of cannabis contained so much mold and microbials that the personnel that handled the biomass got sick.

60.    GR Vending also engaged an independent laboratory to test the cannabis provided by Hello Farms.

61.    Those laboratory tests demonstrate that a portion of Hello Farms' cannabis exceeded the acceptable threshold for (1) three metals: chromium, lead, and nickel; (2) coliforms as a microbial; (3) organic matter; and (4) yeast and mold.

62.    Hello Farms has breached the parties' Agreement and both express and implied warranties by selling cannabis that fails to meet basic quality standards.

### *Hello Farms' Defaults Under the Agreement*

63.    Hello Farms has defaulted under the Agreement by, among other things:

a.    Failing to make cannabis available for payment and pick-up on a rolling basis immediately upon execution of the Agreement.

b.    Producing cannabis that contains unacceptable levels of heavy metals, organic matter and other contaminants.

c.    Failing and refusing to refund GR Vending's Deposit despite GR Vending's demand that Hello Farms do so.

d.    Failing to produce cannabis that is merchantable and fit for its intended purpose, and pass without objection in trade at the time of delivery to GR Vending.

e.    Breaching its covenant of good faith and fair dealing.

*Damages*

64.  Hello Farms' breaches of the Agreement have caused GR Vending to suffer significant damages.

65.  Because GR Vending had not received cannabis that had been promised by Hello Farms, GR Vending was forced to buy wholesale product from other sources to support its supply chain.

66.  Because of Hello Farms' delays, GR Vending missed the opportunity to sell products derived from Hello Farms' cannabis during the crucial December selling season.

## COUNT I — BREACH OF CONTRACT
### (GR Vending)

67.  GR Vending restates and incorporates all prior allegations as if fully set forth herein.

68.  The Agreement is a valid and binding contract.

69.  Hello Farms has defaulted under the terms of the Agreement as described herein.

70.  GR Vending performed all of its obligations under the Agreement until Hello Farms defaulted under the terms of the Agreement.

71.  GR Vending has been damaged and will continue to be damaged because of Hello Farms' defaults, in that it is owed incidental and consequential

damages, including but not limited to its Deposit, pre-judgment interest, cost of cover, damages for non-delivery, and other damages.

WHEREFORE, GR Vending MI, LLC respectfully requests that this Honorable Court enter a judgment in its favor and against Hello Farms Licensing MI, LLC, and award damages, interest, costs, and expenses to GR Vending MI, LLC, along with such other and further relief as this Honorable Court deems just and appropriate.

## COUNT II — BREACH OF EXPRESS WARRANTY
### (GR Vending)

72.     GR Vending restates and incorporates all prior allegations as if fully set forth herein.

73.     The Terms incorporated into the Agreement included express warranties.

74.     Hello Farms also represented, warranted, and guaranteed that its cannabis would "be merchantable and fit for their intended purpose, and pass without objection in trade at the time of delivery to Buyer." (Terms, I.A.(ii).)

75.     Hello Farms breached these express warranties because its cannabis does not conform to the Agreement's testing requirements.

76.     Hello Farms also breached these express warranties because its cannabis is not merchantable and fit for the intended purpose.

47

77.    GR Vending timely revoked acceptance of those lots of cannabis that it did pay for and pick up.

78.    GR Vending has been damaged and will continue to be damaged as a result of Hello Farms' breaches of its express warranties, in that it is owed incidental and consequential damages, including but not limited to its Deposit, pre-judgment interest, cost of cover, damages for non-delivery, and other damages.

WHEREFORE, GR Vending MI, LLC respectfully requests that this Honorable Court enter a judgment in its favor and against Hello Farms Licensing MI, LLC, and award damages, interest, costs, and expenses to GR Vending MI, LLC, along with such other and further relief as this Honorable Court deems just and appropriate.

## COUNT III — BREACH OF IMPLIED WARRANTIES
### (GR Vending)

79.    GR Vending restates and incorporates all prior allegations as if fully set forth herein.

80.    Hello Farms is a merchant with respect to cannabis.

81.    The Agreement does not exclude, modify, or negate implied warranties, including that the cannabis shall be merchantable, is fit for a particular purpose, and other implied warranties that arise from course of dealing or usage of trade in the cannabis industry.

82.     Hello Farms has breached the implied warranty of merchantability and implied warranty of fitness for a particular purpose by selling cannabis to GR Vending that has unacceptable levels of mold, microbials, and heavy metals including lead, chromium, and nickel.

WHEREFORE, GR Vending MI, LLC respectfully requests that this Honorable Court enter a judgment in its favor and against Hello Farms Licensing MI, LLC, and award damages, interest, costs, and expenses to GR Vending MI, LLC, along with such other and further relief as this Honorable Court deems just and appropriate.

## COUNT IV — STATUTORY CONVERSION
### (GR Vending)

83.     GR Vending restates and incorporates all prior allegations as if fully set forth herein.

84.     Hello Farms is unlawfully retaining and exercising wrongful dominion and control over the Deposit that rightfully belongs to GR Vending.

85.     GR Vending has demanded payment of the Deposit that Hello Farms is unlawfully retaining.

86.     Hello Farms refuses to comply with GR Vending's demand for payment of the Deposit.

87.     The acts described above constitute an unlawful conversion of the Deposit, which belongs to Hello Farms.

49

88.    As a result, Hello Farms is liable for statutory conversion under MCL 600.2919a.

89.    Pursuant to MCL 600.2919a, GR Vending is entitled to treble damages and attorneys' fees.

WHEREFORE, GR Vending MI, LLC respectfully requests that this Honorable Court enter a judgment in its favor and against Hello Farms Licensing MI, LLC, and award treble damages, interest, attorneys' fees, costs, and expenses to GR Vending MI, LLC, along with such other and further relief as this Honorable Court deems just and appropriate.

## COUNT V — DECLARATORY JUDGMENT
### (GR Vending)

90.    GR Vending restates and incorporates all prior allegations as if fully set forth herein.

91.    There is an actual controversy between GR Vending and Hello Farms regarding the Agreement, whether Hello Farms has breached its obligations under the Agreement.

92.    A present adjudication of this controversy is necessary to guide the parties' future conduct and preserve the parties' legal rights.

93.    GR Vending requests a declaration from this Court that it is excused from its obligations under the Agreement.

WHEREFORE, GR Vending MI, LLC respectfully requests that this Honorable Court order a speedy hearing and advance it on the calendar pursuant to MCR 2.605(D), and find, determine, and declare that GR Vending MI, LLC's obligations under the Agreement are excused, enter judgment in its favor and against Hello Farms, and award GR Vending MI, LLC its costs and expenses, and grant it such other and further relief as this Honorable Court deems just and appropriate.

## COUNT VI — DECLARATORY JUDGMENT
### (Cura MI)

94.     Cura MI restates and incorporates all prior allegations as if fully set forth herein.

95.     Cura MI guaranteed GR Vending's obligations to Hello Farms under the Agreement. (**Exhibit A** at p. 5.)

96.      Cura MI entered into that certain Guaranty that is a part of the Agreement for the benefit of Hello Farms. (Ex. A at p. 5.)

97.     There is an actual controversy between Cura MI and Hello Farms regarding the Guaranty and whether Cura MI has any further obligations under the Guaranty as a result of Hello Farms' prior material breaches of the underlying Agreement.

98.     A present adjudication of this controversy is necessary to guide the parties' future conduct and preserve the parties' legal rights.

99.    Cura MI requests a declaration from this Court that it is excused from its obligations under the Guaranty.

WHEREFORE, CURA MI, LLC respectfully requests that this Honorable Court order a speedy hearing and advance it on the calendar pursuant to MCR 2.605(D), and find, determine, and declare that CURA MI, LLC's obligations under the Guaranty are excused, enter judgment in its favor and against Hello Farms, and award CURA MI, LLC its costs and expenses, and grant it such other and further relief as this Honorable Court deems just and appropriate.

Dated: March 17, 2021                 Respectfully submitted,

By:  */s/ Christopher J. Zdarsky*
HONIGMAN LLP
William B. Berndt (ARDC No. 6269408)
Christopher J. Zdarsky (P81809)
300 Ottawa Avenue NW, Suite 4000
Grand Rapids, MI 49503
(616) 649-1974
wberndt@honigman.com
czdarsky@hongiman.com

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

This is to certify that on March 17, 2021, a copy of the foregoing was electronically filed with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.


*/s/ Christopher J. Zdarsky*

# EXHIBIT A

**AMENDED AND RESTATED**
**PURCHASE ORDER AGREEMENT**

This Amended and Restated Purchase Order Agreement dated November ___23___, 2020 by and between **GR VENDING MI, LLC,** a Michigan limited liability company, and **HELLO FARMS LICENSING MI LLC,** a Michigan limited liability company, amends, replaces and restates that certain Purchase Order Agreement between GR Vending MI, LLC and Hello Farms, LLC dated October 5, 2020, as follows:

**Term:** GR VENDING MI, LLC, or one or more of its licensed affiliates, ("Curaleaf") shall purchase a minimum guarantee of two (2) harvests (2020 and 2021), with a right of first refusal for the purchase of an additional two (2) harvests (2022 and 2023) from Hello Farms' outdoor growing facility in Au Gres, Michigan.

Curaleaf's right of first refusal to purchase the 2022 and 2023 harvests shall be exercised, in writing, no later than November 1, 2021, subject to the parties reaching mutually acceptable terms in a new agreement and pricing in writing, not later than December 1, 2021. Such extension shall be for both the 2022 and 2023 harvests. Curaleaf may only retain its right of first refusal the extension if it is not in default of the terms of this Agreement and agrees to purchase one hundred percent (100%) of the 2022 and 2023 harvests of Biomass produced by Hello Farms. In the event the parties do not reach a written and executed agreement by December 1, 2021 regarding Curaleaf's purchase of the 2022 and 2023 harvests, the right of first refusal is terminated and Hello Farms is free to sell its harvests to any purchaser.

**Guaranteed Biomass:** Curaleaf agrees to purchase 100% of the marijuana biomass (blended A "buds," B "buds" and trim (un-remediated) produced by Hello Farms in its 2020 and 2021 harvests ("Biomass"), and the Biomass delivered is to be no less than the entire plantable land at the outdoor grow facility in Au Gres, Michigan. The first harvest from Hello Farms under this Agreement is expected to take place in October/November 2020 with approximately 6,000 plants generating an anticipated 12,000 - 15,000 pounds of Biomass. Hello Farms shall not conduct any processing of the Biomass, which such Biomass shall be processed by Curaleaf. Such Biomass shall not include stalks or leaf fans (for clarity, sugar leaves are acceptable in the Biomass).

**Deposit:** Curaleaf agrees to pay 20% of the total estimated purchase price in the amount of Two Million Two Hundred Thirty-Seven Thousand Eight Hundred and 00/100 Dollars ($2,237,800.00) to Hello Farms on or before October 1, 2020, for the 2020 harvest based on an estimated 6700 lbs of Biomass. As to future harvests, the 20% deposit shall be based on the estimated harvest weight of the Biomass and the applicable price, as mutually agreed between the parties. The deposit terms apply to all future purchases. This deposit amount ("Deposit") is subject to refund if Hello Farms does not sell all of its Biomass upon harvest in full, passing local and state recreational cannabis testing requirements and entirely meeting all requirements of this Purchase Order Agreement and the Terms and Conditions. If Curaleaf fails to or decides, for whatever reason, to not purchase the agreed Biomass, the Deposit will be forfeited. If, for any reason, the harvest is partially or entirely destroyed, the Deposit shall be refunded to Curaleaf on a pro rata basis, so long as Curaleaf is not in default of this Agreement, and Hello Farms shall have no recourse against Curaleaf for any loss.

For the 2021 harvest, Curaleaf will visit the cultivation the week of September 1, 2021 to inspect the harvest; at this visit, the harvest date will be mutually agreed upon by the parties and the Deposit shall be made by Curaleaf thirty (30) days prior to the agreed upon harvest date. Upon failure of Curaleaf to timely pay the Deposit, Hello Farms, at its option, may terminate this Agreement in writing to Curaleaf and not be obligated to sell the Biomass to Curaleaf as stated herein for the then current or future harvests, upon, to and including the 2022 and 2023 harvests. Should Curaleaf exercise its right of first refusal to purchase the 2022 and 2023 harvests, such inspection and Deposit shall be subject to the terms mutually agreed upon by the parties as stated in the Term section above, with the dates set for the weeks of September 1, 2022 and September 1, 2023, respectively.

**Testing Requirements:** If the Biomass, partially or in full, does not pass State of Michigan lab testing requirements, as established by the Michigan Marijuana Regulatory Agency, for heavy metals, additives,

and pesticides, but specifically excluding and excepting any testing requirements for microbials ("Passing COA"), Curaleaf is entitled to a refund of its Deposit on a pro-rata basis. Hello Farms is solely responsible for the selection of a duly licensed and reputable testing lab and associated testing costs and expenses, subject to Curaleaf's prior consent, not to be unreasonably withheld.

Per state regulation, at least every 50 lbs. of biomass must be tested (or a greater weight as may be approved or allowed by MRA). Hello Farms intends to create Batches that fall just below the 50 lbs. threshold. Each such Batch will therefore need to have a Passing COA. For each Batch, if the first Batch tested COA does not meet the foregoing Passing COA specifications ("Non-compliant Batch"), a second test will be conducted at Hello Farms' expense. If the second Batch tested COA does not meet the foregoing specifications, the Batch shall be subject to rejection or price renegotiation. If a Batch is rejected by Curaleaf, the Deposit shall be refunded to Curaleaf on a pro-rata basis. Furthermore, if testing of ten Batches (or at least one quarter of the lot) falls below the foregoing specifications, this agreement is subject to termination by Curaleaf within seven (7) business days of Curaleaf's receipt of all of the applicable COAs and, if terminated, the Deposit shall be refunded. If not rejected or terminated within such seven (7) business days, the Biomass shall be deemed accepted by Curaleaf. If the parties renegotiate the price, such change shall be in writing, approved by the parties. If the renegotiation of the price fails within seven (7) days after communication, then either party may terminate upon written notice to the other within seven (7) days or the Biomass shall be deemed accepted by Curaleaf, in accord with the pricing for that harvest, as contained herein. For clarity, upon termination of this Agreement, or rejection of a Batch based on noncompliance with Passing COA thresholds, the Deposit shall be returned to Curaleaf on a pro rata basis. Upon rejection of a non-compliant Batch or termination of this Agreement, and the return of the any Deposit amounts due and owing to Curaleaf, Hello Farms is free to sell said Batch to any other party.

**License Maintenance:** Hello Farms shall be responsible for maintaining its cannabis license(s) for its grow facility in Au Gres, Michigan in good standing throughout the term. Any change in this license status where Hello Farms cannot legally sell cultivated cannabis, and its license(s) is not reinstated within thirty (30) days, will cause this agreement to be null and void. Curaleaf shall be responsible for maintaining its cannabis license(s) in good standing throughout the term. Any change in this license status where Curaleaf cannot legally purchase cultivated cannabis and its license(s) is/are not reinstated within thirty (30) days shall cause this Agreement to be null and void and any pre-paid Deposit shall be returned to Curaleaf, so long as Curaleaf is not in default of this Agreement.

**Biomass Pricing:** Biomass for the 2020 harvest shall be priced at One Thousand and 00/100 Dollars ($1,000.00) *per dried lb* for any Lot averaging THC potency testing of twelve percent (12%) and above. Prices for lesser THC potency testing levels shall be as follows:

| Average Lot THC Potency Testing Level | Price Paid Per Dried Pound |
|---|---|
| 12.00% and above | $1,000 |
| 11.00% – 11.99% | $917 |
| 10.00% – 10.99% | $834 |
| 9.00% – 9.99% | $751 |
| 8.00% – 8.99% | $668 |
| 7.00% – 7.99% | $585 |
| 6.99% and below | $100 |

Should any Biomass THC Potency fall below 7%, the price per dried pound shall be $100, or Hello Farms

shall have the option to sell said Biomass to a third party. The "Average Lot THC Potency Testing Level" is determined by dividing the total potency testing level of all batches in a Lot by the number of potency tests for all batches in a Lot (i.e., if 20 potency tests have a total potency level of 250, then the calculation is 250 ÷ 20 = 12.50% for the "Average Lot THC Potency Level" and the price of $1,000 per dried lb. is paid for said Lot). In all calculations concerning potency test levels, the numeric figures shall include two numbers to the right of the decimal point (as stated in the potency testing reports). To avoid any doubt, the per lb. price paid for all batches in a Lot is the price based on the Average Lot THC Potency Testing Level for the entire Lot and not based on the potency level of an individual batch.

The price above is firm for the 2020 harvest and shall not be subject to any change pursuant to the Index Price Adjustments, as stated below.

For the 2021 harvest, the adjusted price for twelve percent (12%) and above THC potency shall be no less than $850.00 per lb. (or more), as calculated by the Index Price Adjustment and decreased from that price by $83.00 per the applicable Average Lot THC Potency Testing Level.

**Payment/Pickup/Acceptance**: Commencing during each harvest season, Hello Farms shall prepare lots of harvested Biomass in increments of between 500 and 1,000 dried lbs. separated into the three (3) Biomass categories ("Lot" or "Lots"). For clarity, each 50 lbs of Biomass shall require an individual Passing COA per MRA regulations ("Batch"), and each Lot shall consist of between 10 and 20 Batches. Hello Farms shall notify Curaleaf that a lot is ready for pick-up and provide the testing data indicating that the Biomass has met the Passing COA thresholds, as stated above, and the corresponding invoice. As set forth below, within seven (7) business days of receiving such notification and invoice, Curaleaf shall issue ACH or other means of electronic payment in "good funds" to a financial institution as designated by Hello Farms. Subsequent to confirmation of the payment, Curaleaf may pick-up the designated Biomass lot at Hello Farms' Au Gres facility. Pick-up of the Biomass by Curaleaf shall constitute irrevocable delivery to and acceptance by Curaleaf, which shall be able to inspect the Biomass on site. Any rejection shall occur prior to Curaleaf removing Biomass from the Hello Farms outdoor grow facility in Au Gres, Michigan. Hello Farms shall retain the Deposit for the harvest until eighty percent (80%) of the harvested Biomass has been purchased and picked up. Thereafter, upon invoicing, Curaleaf will send its written confirmation that the Deposit funds shall be credited against remaining purchases of the harvested Biomass. In the event that any amount of the Deposit remains after all harvested Biomass has been paid for and picked up, Curaleaf may request a refund of the Deposit or apply the amount to the following year's harvest Deposit. Curaleaf will pay for Biomass within seven (7) business days after receiving and accepting a Passing COA. If Curaleaf does not make payment within seven (7) business days of receipt and acceptance of a Passing COA, Hello Farms has a right to sell remaining Biomass to third parties. Hello Farms agrees to store Biomass for a period of sixty (60) days after receipt by Curaleaf of passing COA's for the entire first lot and after payment is received from Curaleaf until such time as processing and transportation can be arranged by Curaleaf. Hello Farms agrees to be responsible for maintaining appropriate storage conditions for the Biomass until Curaleaf takes physical possession. Hello Farms shall be responsible for all costs in connection with security services for the stored product through December 30, 2020, after which Curaleaf shall bear any security costs for stored product. Revocation or rejection by Curaleaf, after inspection, of the Biomass, shall take place prior to Curaleaf taking physical possession. For clarity, all harvested Biomass, which is being purchased by Curaleaf shall be picked up by Curaleaf (after Curaleaf's inspection) no later than sixty (60) days after receipt by Curaleaf of Passing COA's for the first lot (the "Deadline"). After the Deadline, if Curaleaf has not yet picked up the applicable product, Curaleaf shall pay for any reasonable expenses Hello Farms incurs in order to continue to store such product in compliance with the provisions of this Agreement for such extension of pickup time that Curaleaf may request. In addition, if any Biomass purchased by Curaleaf remains at the Au Gres facility after the Deadline, Curaleaf agrees to: 1) have paid Hello Farms in full for all purchased Biomass and all sums paid are deemed fully earned by Hello Farms; ii) such Biomass is deemed accepted by Curaleaf; iii) Curaleaf accepts the risk of loss for such Biomass remaining at the Au Gres facility so long as Hello Farms continues to store such Biomass in compliance with this Agreement at Curaleaf's expense, pursuant to the preceding sentence. Notwithstanding the foregoing, Curaleaf shall remove all such Biomass no later than the 75th day after receipt by Curaleaf of Passing COA's for the first lot.

3

**Index Price Adjustments per harvest:** After the week following the end of the quarter prior to the 2021 harvest, a report will be generated, where data derived from the MRA website link here: https://www.michigan.gov/mra/0,9306,7-386-93032-497635--,00.html will be used to calculate the year on year % change in average retail price of flower for the quarter, provided that no price increase from one harvest to the next may exceed **+5%** of the then current pricing, and no price decrease from one harvest to the next may exceed **-15%**. (See Exhibit A for an example calculation.) Further, the prior year Biomass Pricing shall serve as the base price to be adjusted for the next harvest on a "going forward" basis without any "catch up" adjustment (any amount in excess of the limits stated above) from a prior year, whether an increase or a decrease.

Notwithstanding the potential price adjustments (increase or decrease) for the 2021 harvest, the following shall apply and supersede any such price adjustment:

  a. For the 2021 harvest, in no event shall the adjusted price for the Biomass be less than $850 per dried lb., unless THC Potency drops below 12% as set forth above

This order will be FOB Delivery Point. To remove any absence of doubt, in this instance, "FOB Delivery Point" shall mean: (i) with payment being made by Curaleaf prior to delivery; (ii) delivery shall constitute Curaleaf picking up the Biomass from Hello Farms' Au Gres, Michigan facility; and (iii) title to the Biomass shall pass upon confirmed payment to Hello Farms and pick up of the Biomass from the Au Gres facility, and subject to those certain Curaleaf Terms and Conditions, which are incorporated herein by reference.

**Agreement Controls:** In the event of any conflict between this Agreement and the Terms and Conditions, the provisions of this Agreement shall control and be binding.

**No Assignment:** Neither party may assign any portion or all of its rights, benefits, title or obligation under this Agreement to another entity or party, without the express, written consent of the other party. Such consented-to assignment shall be in writing and the assigning party shall notify the other party hereto within twenty-one (21) days of the effectiveness of the assignment. The assignee shall agree in writing to abide by the terms and conditions of this Agreement.

**Marketing:** Curaleaf and Hello Farms may, subject to prior written approval from Curaleaf's Marketing department and leadership team, include a mutually agreed upon reference to Hello Farms in end packaging to consumers (i.e., "powered by Hello Farms"), at no additional cost, fee or expense to Hello Farms. Further, the Curaleaf may agree to issue a press release concerning Curaleaf's purchase and use of Hello Farms' product, subject to prior written approval from Curaleaf's leadership team.

**Binding Effect:** This Agreement is binding upon the parties, their successors and assigns, as to the 2020 and 2021 harvests, regardless of when and whether a Deposit is made by Curaleaf.

PURCHASER:                                              SUPPLIER:

GR VENDING MI, LLC                           HELLO FARMS LICENSING MI, LLC

By: _____                By: _____

Name:  Matt Darin                                    Name:  Nahidah Meiou
Title:    Authorized Signatory                   Title:    Member

Date: November ___23___, 2020            Date: November 23, 2020

Address:   344 N. Ogden, 5th Floor        Address:   580 Shenfield Rd.
                 Chicago, IL 60607                                    Au Gres, MI 48703

4

## <u>GUARANTY</u>

CURA MI, LLC ("Guarantor") unconditionally agrees to guaranty, for the benefit of Supplier, the prompt payment of all sums due to Supplier and performance of all other obligations of Purchaser under this Amended and Restated Purchase Order Agreement and the Amended and Restated Terms and Conditions.  This Guaranty is a guaranty of payment and not collection.  The Supplier is not required to exhaust any remedies or take any action against Purchaser, except Supplier shall notify the Guarantor of any default by Purchaser under this Agreement and the Terms and Conditions.

GUARANTOR:

CURA MI, LLC

By: _____

Name:   Joseph Bayern
Title:   President

Date:_____11/24/2020_____

5

## Exhibit A

| S/lb - USD | Q3 2020 | | | | Q3 2021 | | | | | AVG % Change | % Applied to Curaleaf Pricing |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | July | August* | September* | Average | July | August* | September* | Average | | | |
| MRA Retail price of flower | $4,279 | $4,000 | $3,900 | $4,060 | $3,500 | $3,300 | $3,300 | $3,367 | | -17.1% | -15.0% |
| MRA Retail price of trim | $2,669 | $2,500 | $2,300 | $2,490 | $2,300 | $2,200 | $2,100 | $2,200 | | -11.6% | -11.6% |
| Average | $3,474 | $3,250 | $3,100 | $3,275 | $2,900 | $2,750 | $2,700 | $2,783 | | -15.0% | -15.0% |

| S/lb - USD | Current Price | % Applied to Curaleaf Price | New Price per lb |
|---|---|---|---|
| Blended Biomass Price per lb | $1,000 | -15.0% | $850.0 |

*All future MRA figures are for example purposes only, and do not reflect and expected projections or actuals

Open.27888.94928.25231930-1

# AMENDED AND RESTATED

# CURALEAF

# TERMS AND CONDITIONS

### I.   Warranty, Guaranty and Indemnity

In consideration of the purchase, from time to time, by **GR VENDING MI, LLC** (together with its employees, agents, affiliates, parents, and subsidiaries, "Buyer"), of goods and services (together, "Goods") from the undersigned ("Seller") Seller, on behalf of itself, its employees, agents, affiliates, parents, affiliates and subsidiaries ("Seller Parties"), hereby agree to these Terms and Conditions ("Terms") which are incorporated by reference into the applicable purchase order(s) ("Orders") by and between the parties. **Seller hereby:**

> **A.   Represents, warrants, and guarantees** that, as of the time of delivery, all Goods shall: (i) conform to the Purchase Order Agreement testing and THC Potency qualifications and bulk packaging requirements sent to Seller in writing by Buyer, and (ii) be merchantable and fit for their intended purpose, and pass without objection in trade at the time of delivery to Buyer, and (iii) be accompanied a passing Certificate of Analysis (COA) that meets or exceeds applicable standards set by Buyer for a Passing COA, as defined in the Purchase Order Agreement;

> **B.   Represents and warrants** that it has, or immediately prior to delivery shall have, title to all Goods and all rights necessary to transfer such rights and title to Buyer free of any lien, pledge, hypothecation or other encumbrance, including but not limited to all patent, copyright, trademark, service mark, and trade secret (collectively, "Intellectual Property") rights required or appropriate for its production of Goods, and sale of Goods to Buyer;

> **C.   Agrees to indemnify**, hold harmless, and, if requested by Buyer, to defend Buyer from and against any and all claims, demands, lawsuits, actions, proceedings, liabilities, fines, penalties, imposts, fees, costs, losses, and expenses (including, but not limit to, reasonable attorney fees and costs) brought against or incurred by or on behalf of Buyer and/or Goods:

>> **1.**   Arising out of or pertaining to any breach or alleged breach by Seller of paragraphs IAor IB above;

>> **2.**   For or because of the injury, illness and/or death of any person, or loss of or damage to any property (including, but not limited to, any judgment rendered against or settlement paid by or on behalf of Buyer in any such action), that arises in the course of Seller's handling, shipment, or delivery of Goods.

>> **3.**   Notwithstanding any provision hereof to the contrary, Seller provides no indemnity under these Terms against liability arising out of the negligence or intentional misconduct of Buyer or acts of the Buyer after delivery of the Goods to Buyer including, but not limited to, the Buyer's processing of the Goods.

> **D.   Agrees that**, in the event that Goods, or any of them, violate or infringe upon the Intellectual Property rights of a third party, Seller shall obtain for Buyer all rights necessary for Buyer to lawfully continue using or selling the Goods as contemplated (or shall obtain for Buyer the opinion of an attorney acceptable to Buyer that such use or sale is lawful), and shall repurchase from Buyer, at Buyer's cost, Goods that Buyer cannot reasonably and lawfully sell or use as contemplated due to such infringement or violation.

### II.

Seller provides no warranty under paragraphs IA or IB (nor indemnity under paragraph ID) of these Terms against the adulteration or misbranding of any Goods within the meaning of the FD&C Act or any other applicable laws or ordinances which occurs after delivery to Buyer and is not caused by any act or failure to act on the part of Seller (provided that any adulteration which is found to exist after delivery and which is caused by any defect in the packing of Goods or by any defect in the packaging in which Goods are packed by Seller shall be deemed to have existed at the time of delivery);

### III.

Buyer will provide reasonable notice to Seller of any seizure of Goods or service of process in any proceeding or action alleging any act or omission contrary to the requirements of paragraphs IA or IB above.

### IV.   Purchase Orders; Documents; Sales

Buyer may, as Buyer and Seller may from time to time agree, place Orders hereunder by Electronic Data Interchange (EDI), by facsimile, or by other written means. Seller shall comply with all reasonable Buyer billing, payment, pricing, and document rules, as may be agreed upon by the parties. Neither the terms of the Order nor these Terms shall be modified by any terms set forth in an invoice or shipping documents.

### V.   General Specifications

> **A.**   Buyer may, from time to time, establish and/or change reasonable safety, logistical, and other specifications and requirements generally applicable to vendors, products, or services of a particular category or type ("General Specifications") in writing sent to Seller, the then-current version of which shall be deemed into each Order. Buyer may, from time to time, by providing at least twenty (20) days' advance written notice (which may include electronic mail) to Seller, revise such General Specifications; Seller shall promptly notify Buyer of any revised General Specifications with which it is unable to comply. Except as the parties may otherwise agree, in writing, if Seller is not able, or otherwise fails, to comply with any General Specification, Buyer shall have the option, in its sole discretion, of terminating any purchasing arrangement or agreement Buyer may have with Seller, and such termination shall not constitute a breach of any such arrangement or agreement. Notwithstanding the foregoing, such General Specifications, as amended, shall not materially change the Purchase Order Agreement between Buyer and Seller or materially increase the Seller's costs.

> **B.**   Seller shall, at Seller's expense, package, mark, and document all Goods in accordance with good commercial practices, and shall be responsible for

any additional cost Buyer may incur resulting from Seller's failure to do so.

## VI. Shipment; Delivery

A. Buyer shall notify, in writing, in order for Goods and Seller shall make such Goods available at its Au Gres facility for pick-up by Buyer, subject to prior payment to Seller, pursuant to Section VII below.

## VII. Payment

A. Unless otherwise agreed in writing between the parties, payment shall be made in accordance with the Purchase Order Agreement.

B. Unless otherwise stated, Buyer's purchases for resale and Seller's pricing should not include sales, use, or like taxes. Seller's invoicing of Buyer for any tax or fee shall constitute Seller's warranty that it is duly registered with the agency which levies the tax or fee. If Seller collects a sales or use tax but does not remit the tax or fee to the appropriate agency, or if the same tax or fee is subsequently assessed against Buyer, Seller shall reimburse Buyer for all amounts of tax or fee Buyer has remitted and Seller shall defend, indemnify and hold Buyer harmless against all losses, fines, penalties, interest and expenses (including reasonable attorneys' fees) related in any way to such unpaid tax or fee.

## VIII. Rejection (and Revocation of Acceptance) of Non-Conforming Goods

In accordance with the terms set forth in the Purchase Order Agreement, Buyer, at its sole option, may (within a reasonable time after it has had an opportunity to inspect) reject (or revoke acceptance of) and either return to the Seller or hold at Seller's risk and expense any Goods that at the time of or prior to delivery at Seller's Au Gres facility (a) do not conform to Buyer's specifications, as specifically stated in the Purchase Order Agreement, (b) do not otherwise conform to the applicable order, (c) violate any law, regulation, or court or administrative order, or (d) infringe any third party's patent, trademark, copyright or other intellectual property right, provided, however, that Buyer's failure to reject (or to revoke acceptance of) any Goods shall not relieve Seller of responsibility for any warranty with respect to such Goods under these Terms or otherwise. Payment of any invoice shall not waive Buyer's right to reject or revoke acceptance of Goods at the time or prior to delivery to Buyer at the Seller's Au Gres facility. Buyer's right to reject (or revoke acceptance of) and to return or hold Goods shall, without limiting such right, extend to Goods returned by Buyer's customers for any reason stated in this Section except where due to any intervening act or cause after delivery to Buyer. At Buyer's option, with respect to any Goods that Buyer rejects or revokes acceptance of hereunder, Seller shall refund or credit to Buyer, or Buyer may offset against amounts it owes to Seller, the cost of such rejected Goods.

## IX. Recalls; Tainted Products Claims

A. If Goods, because of a condition which exists at the time of delivery to Buyer (or which results from such condition), are the subject of a recall (or safety notice) initiated by Seller, Buyer, or a government or consumer protection agency, Seller shall be responsible for all reasonable costs and expenses associated with the recall or notice and shall reimburse Buyer for all reasonable costs and expenses incurred by Buyer in

recalling, publishing notices about, shipping and/or destroying such Goods (and, where applicable, any products with which such Goods have been packaged, consolidated or commingled) at Buyer's net landed cost therefor, including Buyer's reasonable administrative fees and refunds to customers.

B. Upon learning or receiving notice of a credible claim or potential claim of a defect in, or tampering with, any Goods, Seller shall promptly notify Buyer and, if appropriate, contact the MRA and/or other appropriate government agency, and shall immediately conduct at its expense sufficient analyses of such Goods to reliably determine the accuracy of such claim and the cause of any such defect or tampering.

C. The parties shall assist each other in all reasonable ways to resolve any claims involving Goods subject to a recall or safety notice.

## X. Trademarks; Trade Dress; Service Marks

All of Buyers' trademarks, service marks, and trade dress ("Buyer Trademarks") shall be and remain the property of the owner thereof, notwithstanding any provision of these Terms. Seller shall not use Buyer Trademarks in connection with the sale or endorsement to any third party of any goods or services without the prior written consent of Buyer. Seller shall issue no press release, article, or other publication with respect to transactions under these Terms without the prior approval of such publication by Buyer. Seller acknowledges that violation of this provision may cause irreparable harm to Buyer, and shall entitle Buyer to equitable relief, including injunction, in addition to all remedies available at law.

## XI. Labeling and Packaging

(Intentionally left blank.)

## XII. No Salvage

(Intentionally left blank.)

## XIII. Compliance with Laws and Standards

A. Seller represents and warrants that: (i) it is a legal entity duly organized and in good standing under the laws of the state (or other governmental entity) of its organization, with full capacity to sue and to be sued; (ii) it is authorized to enter into and be bound by the terms of these Terms; and (iii) neither these Terms nor Seller's performance hereof shall be a violation of applicable law or the terms of any material contract, instrument or agreement to which Seller is subject.

B. Seller represents and warrants that the Seller Parties (i) shall comply with all applicable laws and local government regulations regarding labor, child labor, minimum wage, living conditions, overtime, working conditions, and the environment, and (ii) shall not use forced prison labor or the labor of children under the age of 14. Seller hereby certifies, as of the date of these Terms and the date of each delivery of Goods hereunder, that no involuntary labor (including, but not limited to, prison labor or slave labor) or child labor (as defined by applicable law) has been used in manufacture, sale, or delivery of such Goods.

C.  Seller agrees to provide such information as Buyer may reasonably request to enable Buyer to comply, and to facilitate Buyer's compliance, with applicable federal, state, and local statutes, rules, regulations, ordinances, orders, and other imperatives (collectively, "Requirements"). Seller further agrees to comply with such rules as may be promulgated by Buyer with respect to such Requirements, so long as they have been mutually agreed upon by Seller and Buyer. Seller warrants, now and as of the time of each delivery of Goods hereunder, that such information as it shall provide to Buyer under this Section XIII.C shall be true, accurate, and complete in all material respects.

D.  With respect to any of Buyer's employees who are on-site at Hello Farms' Au Gres premises, the Buyer shall cause its employees to cooperate with Seller in all state law or regulations compliance, including providing employee information and submitting to a background check.

### XIV.  Insurance

A.  Seller shall obtain and maintain, at its expense for so long as it shall provide Goods hereunder, a policy or policies of Commercial General Liability insurance (including product and completed operations, personal and advertising injury and contractual liability coverages) covering the Seller Parties written on an occurrence form with minimum limits of $2,000,000 per occurrence/$2,000,000 aggregate (which limits may be satisfied by the combination of underlying and excess (umbrella) policies). Each such policy shall be underwritten by insurers rated "A- VII" or better by A.M. Best Company subject to final approval by the Buyer, which shall not be unreasonably withheld. If Seller's employees will enter Buyer's premises or perform work on Buyer's behalf at the facilities of any of Buyer's customers, Seller shall obtain and maintain, at its expense and for so long as such employees shall conduct such operations, a policy or policies of Workers' Compensation insurance with statutory limits and Employers' Liability (Stop-Gap Liability) insurance with minimum limits of $1,000,000.

B.  Seller will provide Certificates of Insurance naming Buyer as "Additional Insured," with respect to General Liability including products liability and shall cause a Broad Form Vendor's Endorsement (ISO Form CG2015) in favor of Buyer to be attached to such policies. Seller shall provide such Certificates of Insurance upon Buyer's written request, and shall provide updated Certificates of Insurance when coverage is renewed or materially changed and as may be requested from time to time by Buyer.

C.  Policy limits will not be reduced, terms changed, or policy canceled upon less than thirty (30) days prior written notice to Buyer. Seller's insurance will be primary with respect to all Seller obligations under these Terms. Seller shall assure that all of its agents, representatives, subcontractors and independent contractors comply with the foregoing insurance requirements. Insurance coverage and limits referred to above will not in any way limit the liability of the Seller.

D.  In the event Seller fails to obtain and maintain the required insurance as set forth in this Section within thirty (30) days of signing the Agreement, Buyer shall have the right to terminate the Agreement and receive a refund of any deposit or amounts paid under the Purchase Order Agreement for Goods not yet delivered.

E.  Buyer shall maintain and keep in full force an effect, for so long as Buyer's employees shall conduct any business at or be on the Hello Farms' Au Gres premises, a policy or policies of Workers' Compensation insurance with Statutory Limits and Employer's Liability (Stop-Gap Liability) insurance with limits of $1,000,000.

### XV.  General Terms

A.  These Terms shall be governed by and construed in accordance with the laws of the State of Michigan. In the event that any term or provision hereof is held by a court having competent jurisdiction to be invalid or unenforceable, such term or provision shall be deemed severable, and the remainder hereof shall remain in full force and effect. Seller shall remain bound by these Terms notwithstanding any assignment or attempted assignment by Seller of its interests herein. These Terms shall be and remain binding upon the parties hereto and their respective successors and assigns.

B.  No amendment, modification or waiver of any term of these Terms shall be effective unless set forth in writing and signed by an authorized representative of each party.

C.  These Terms shall be effective as of the date of execution by Seller and shall continue in effect with respect to all Goods purchased or ordered by Buyer from Seller until revoked, in writing, by Buyer and Seller. When executed (without modification) by Seller and delivered to Buyer, these Terms shall supersede any previous Terms and Conditions executed by Seller for the benefit of Buyer.

D.  In the event of any conflict between the Purchase Order Agreement and these Terms and Conditions, the provisions of the Purchase Order Agreement shall control and be binding.

### XVI.  Amended and Restated Terms and Conditions

This Amended and Restated Curaleaf Terms and Conditions amends, replaces and restates the terms and conditions previously signed as "10/1/2020 Revision" by and between GR Vending MI, LLC and Hello Farms, LLC.

**BUYER:**

**GR VENDING MI, LLC**

By:_____

Its:___Authorized Signatory___

**SELLER:**

**HELLO FARMS LICENSING MI, LLC**

By:_____

Its:___Member___